J. B. BURNS *v.* BOARD OF SUPERVISORS OF SMITH COUNTY.

[59 South. 796.]

REMOVAL OF COUNTY SEAT. *Elections.* *Obligation of board of supervisors.* *Constitution* 1890, *section* 259. *Laws* 1910, *chapter* 314, *section* 2.

Under Constitution 1890, section 259, so providing, no county seat shall be removed unless authorized by two-thirds of the electors of the county voting therefor, but when the proposed removal shall be towards the center of the county, it may be made when a majority of the electors participating in the election shall vote therefor. And under Laws 1910, chapter 314, section 2, providing

that the result of an election on the question of removal shall be certified to the board of supervisors, and if the necessary number of votes have been cast for removal, the board shall order an election to submit as to what point the county seat shall be removed. Where an election was held and two-thirds of the electors did not vote for removal and the proposed removal was not towards the center of the county, mandamus will not lie to require the board to submit to the electors the question as to what point in the county the seat of justice shall be removed.

Appeal from the circuit court of Rankin county.

Hon. C. L. Dobbs, Judge.

Suit by J. B. Burns against the Board of Supervisors of Smith County. From a judgment sustaining a demurrer to the petition, plaintiff appeals.

The facts are fully stated in the opinion of the court.

*W. T. Simmons* and *T. J. Wills*, for appellant.

It will be noted in the election held on the question of removal or no removal that there were fourteen hundred and one votes cast of which number nine hundred and forty-four were cast in favor of removal and only four hundred and fifty-seven against removal, more than two-thirds of the electors participating in the election voting for removal. There is no contention made but what a majority of the electors participating in the election voted for removal and thereby and to that extent authorized the removal of the seat of justice from its present location. When viewed in the light of the constitutional provision for the removal of a county site, it is manifest that a majority of the qualified electors participating in the election will authorize the removal of the county seat of justice from its present location to a point towards the center of the county, or in other words, to a point nearer the center of the county than the original location.

We invite the court's especial attention to the fact that section 259 of the Constitution of the state of Mississippi of 1890, which authorizes elections for the removal of

county sites contains but one sentence, the exact language of the Constitution is, ''No county site shall be removed unless such removal be authorized by two-thirds of the electors of the county voting therefor; but when the proposed removal shall be towards the center of the county, it may be made when the majority of the electors participating in the election shall vote therefor.'' It was evidently the intention of the makers of the Constitution to provide a method for the removal of county seats in which when the removal was from the center of the county, and thereby making it less convenient to a majority of the resident citizens thereof to require the assent of two-thirds of all of the qualified electors of the county to authorize such removal, and at the same time provide that where a majority of the qualified electors participating in the election vote for removal that it would be authority for the removal of the county site nearer the center of the county, and convenient to the greatest possible number of the resident citizens of such county.

The election held in Smith county on the first day of October, 1912, on the question of the removal of the county seat resulted in a very large majority of those participating in the election voting for removal, and under the constitutional provisions authorized the removal of the seat of justice to some point to be selected, which is nearer the center of the county than its present location. We have no doubt of the correctness of this position. See Board of Supervisors v. Buckley, 85 Miss. 729, 38 So. 104. In this case the court held that where a majority of the electors participating in the elections vote for removal, but less than two-thirds of all the qualified electors of the county that removal to a point more distant from the center of the county than its present location would not be authorized, but they clearly hold that removal to a point nearer the center of the county is authorized by such a vote, and that at a subsequent

election to determine the location, only points nearer the center of the county than the present location of the county site are eligible to be voted on, we quote from the opinion, *supra*:

"In order for removal to carry in favor of a named point, the same constitutional majority would be required to make any change of the county site that would be necessary to move it to the particular place voted for; otherwise we would have the anomalous condition of a change authorized by a mere majority of those participating in the election, and therefore necessarily towards the center of the county, in fact effecting a relocation of a point more distant from the center, thus, in effect, abrogating the constitutional requirement. The argument is faulty, in our judgment, in assuming that a county seat can be ordered removed by a majority vote of those participating in the election, and then, at a subsequent election, the relocation fixed at a point more distant from the center of the county. Nor can this be overcome by saying that at a subsequent election the choice for the location of the seat of justice can be restricted to points nearer the center of the county than the present site. The insuperable obstacles to this course are several: (1) The law authorizing the election provides that at the election to determine 'point of location only' 'the two points which received the highest number of votes at the first election shall be submitted to be voted upon.' In the instant case this plain mandate cannot be followed, because there were no two competing points that received votes at the first election. (2) To move the county site to the only place voted for at the first election would not be a move towards the center of the county, while the votes cast only authorized a removal, if at all, on condition that such move should be to a point nearer the center. (3) The act under consideration expressly recites that, if the seat of justice be moved, it must be to 'some convenient point on the Gulf & Ship Island Railroad.'

While so far as the proof shows, and referring to the general course of the railway as indicated on the maps in evidence, it is doubtful if there is any point on said line of railway nearer the geographical center of the county than is Westville, if this be true, and appellant's contention on this point be sustained, and were we to hold that the removal from Westville had carried, and remand the cause, and direct any other election to be held to decide between competing points on the Gulf & Ship Island Railroad, we would be in the position of having ordered an election to be held to locate a new county site, when in point of fact, under the expressed terms of the act authorizing the election, there would be no point eligible to be voted for, because no point on the Gulf & Ship Island Railroad would be nearer to the center of the county—the only way in which a removal had been authorized by the vote of the electors.''

We present to the court that under the authority of this case that removal has carried to some point nearer the center of the county than the present location, and the positive mandates of the law make it incumbent upon the board of supervisors to order another election to determine between competing points nearer the center of the county than the present location, the permanent location of the seat of justice of Smith county.

*S. L. McLaurin,* for appellees.

The court was clearly right in sustaining the demurrer and dismissing the petition. There are several insuperable barriers to the granting of the writ. The election did not result in favor of ''removal'' within the meaning of the legislative act, as it did not receive a two-thirds majority of the electors of the county. Any other construction of the act would make it mean that a bare majority of those voting in the first election could carry ''removal'' and a bare majority of those voting in the second election could locate the county seat in a remote

corner of the county in plain violation of section 259 of the Constitution. This is apparent from that part of the removal act which refers to the point of location, in the latter part of section 2, which reads as follows: "No point shall be placed on the ticket to be voted on except where two hundred or more electors of the said county shall petition the board of supervisors to place the desired point on the ticket. And the laws governing the holding of primary elections shall govern the holding of the elections to determine the point for the permanent location of the seat of justice of the said county."

The act provides that any point may be put in nomination upon petition of two hundred electors, but it does not provide that the point put in nomination must be towards the center of the county.

The plain mandate of the act is that if "removal" carries in the first election, any point may be put in nomination upon petition of two hundred electors. There is nothing in the act which even intimates that if "removal" receives only a majority vote in the first election, the points to be voted upon shall be restricted to points towards the center of the county. There can be no good reason why the court should undertake to read that provision into the act when the legislature did not put it there. Certainly the act must be construed as it is written and by that test if it does not require a two-thirds majority of the electors of the county in favor of "removal," it follows as the night the day that the Constitution can be circumvented and the county seat removed from Raleigh to the county line by only a majority of those voting for "removal" in the first election and only a majority, or even a plurality, of those voting on the point of location in the second election.

The "removal act" does not provide that if "removal" receives a majority, but not a two-thirds majority, the next election shall determine only between points towards the center of the county. Whether the legislature

could have so provided is not for consideration, as it does not do so. The act provides that if "removal" carries all points in the county can compete, but if "removal" does not carry, no other election is to be held; therefore, it necessarily means that "removal" does not carry unless it receives the necessary two-thirds majority. There is no provision in the statute for removal to half carry. It must be carried or lost. If carried all points may compete in the next election; if lost, no other election is to be held. In a very able opinion rendered by Justice Truly in the case of *Simpson County* v. *Buckley,* 85 Miss. 735, this court in affirming the judgment rendered by Chancellor Mayes says:

"The argument is faulty, in our judgment, in assuming that a county seat can be ordered removed by a majority vote of those participating in the election, and then, at a subsequent election, the relocation fixed at a point more distant from the center of the county. Nor can this be overcome by saying that at a subsequent election the choice for the location of the seat of justice can be restricted to points nearer the center of the county than the present site."

Even if it should be conceded that "removal" carried in the first election, the "removal act" leaves it wholly within the discretion of the board of supervisors as to whether or not any election should be ordered or any further steps taken in the matter. The act plainly says that if "removal" carries, the board is authorized to order another election to select the point of location, but does not say that it shall do so.

The wisdom of the legislature in conferring this discretion on the board of supervisors cannot be inquired into by the court. However, many reasons may be advanced for lodging such discretion in the board, even if two-thirds majority had voted for "removal."

For instance, if at the same time of the election on the removal question the question of issuing bonds to

build a new jail and court house should be submitted and lost, and the power of taxation in the board be not sufficient to raise funds for the new court house and jail, and other expenses, it would be useless for the board to order an election to select a point for the county seat with no prospect of money to build the court house and jail, and remove the county seat. Section 6 of the "removal act" provides for the issuance of bonds only when authorized by a vote of the people as provided in sections 331 and 333 in the Code of 1906.

Another thing which might be of influence with the board in exercising its discretion is the prospect of the location or nonlocation of a railroad line in the proposed point of the county seat, or the building or proposed building of a railroad through the old seat.

Another instance is where three of the supervisors' districts might vote against removal and the other two districts vote so overwhelmingly in favor of removal as to carry it. In that case each supervisor might be governed in his vote by the majority vote of his district. All of these things and many more may have been considered by the legislature in conferring upon the board of supervisors the discretion of ordering or not ordering the second election. But it is not necessary to mention these matters, as the legislative act clearly and unequivocally places the discretion in the board. Another reason why the writ of mandamus will not issue is that the act of the legislature provised for a special session of the board of supervisors five days after the election and, that time having passed, the court will not order the board to do that which the board has no authority to do.

REED, J., delivered the opinion of the court.

This case is before the court upon appeal from the action of the circuit court in sustaining a demurrer to the petition of appellant, praying for the issuance of a

mandamus requiring appellees, the board of supervisors
of Smith county, to order another election, submitting
to the qualified electors of that county the question as
to what point in the county the seat of justice shall be
removed. The following facts are shown in the peti-
tion:

At the regular July, 1912 meeting of the board of su-
pervisors of Smith county, Mississippi, pursuant to the
provisions of chapter 314, Laws of Mississippi of 1910,
a petition was presented, signed by more than seven hun-
dred of the qualified electors of the county, praying the
board of supervisors to order an election on the question
of removal or no removal of the seat of justice of that
county. It is not stated in the petition where it was
proposed to remove the county seat to. At that meet-
ing the board ordered the election to be held on October
1, 1912. The only question submitted was the removal
or no removal of the county seat. At the time the elec-
tion was called there were two thousand nine hundred
qualified electors in the county. On September 1, 1912,
the registration and poll books of the county were de-
stroyed by fire. On October 1, 1912, the day the elec-
tion was held, the names of nineteen hundred and twenty-
eight electors of the county had been restored to the
registration and poll books. At the election fourteen
hundred and one votes were cast, nine hundred and for-
ty-four in favor of removal, and four hundred and fifty-
seven against removal. On October 8, 1912, the board
met and entered an order on its minutes declaring that
the election resulted against the removal.

The question for decision is whether the action of the
board in ordering that the result of the election was
against the removal of the seat of justice is correct.
Section 2, chapter 314, Laws of Mississippi of 1910, pro-
vides that the result of the election on the question of
removal or no removal shall be certified to the board of
supervisors of the county, "who are authorized to as-

semble in special session five days after said election
to receive the same, and if the necessary number of votes
have been cast for removal, as required by section 259
of the Constitution of the state of Mississippi, the board
of supervisors are further authorized at said special
session to order an election for the purpose of submit-
ting to the qualified electors as to what point the seat
of justice shall be removed." It is incumbent upon the
board of supervisors to decide whether the necessary
number of votes have been cast for the removal before
taking further action.

In the present case the board decided that the neces-
sary number had not been cast for removal. It will be
noted that it was provided in the act that the number
cast for removal must be as required by section 259 of
the Constitution. The following is section 259 in full:
"No county seat shall be removed unless such removal
be authorized by two-thirds of the electors of the county
voting therefor; but when the proposed removal shall
be toward the center of the county, it may be made when
a majority of the electors participating in the election
shall vote therefor." It is clear from the provision in
the Constitution that the county seat shall not be gen-
erally removed unless two-thirds of the electors of the
county authorize such removal. The exception to this
is in a case where the removal shall be toward the cen-
ter of the county, and then such removal may be au-
thorized by the vote of the majority of the electors par-
ticipating in the election on the question. Under the con-
stitutional provision, it is clear that the board of su-
pervisors, or any other tribunal, has no power to make
any order of removal of a county seat, except toward
the center of the county, until authority is given by the
affirmative vote of two-thirds of the electors of the
county. The power to make such removal is vested in
the electors. The legislature may, in its discretion, pre-
scribe methods by which the question of removal shall

be submitted to the vote of the qualified electors. If the constitutional majority did not vote for removal, the board had no authority to make further order in the proceedings.

The question of removal of a county seat is fully discussed in the case of *Simpson County* v. *Buckley*, 85 Miss. 713, 38 South. 104, and the following is a quotation from that decision: "By section 259 of the Constitution, county sites throughout the state became fixed and established at the places where they were then located. There they must remain until removed in the manner and by following the method indicated by that section —not by legislative enactment, not by order or judgment of the board of supervisors, but by the affirmative vote of the electorate of the county concerned. If the county site is to be removed to a point more distant from the center of the county than where now located, it must and can only be done when two-thirds of all qualified electors of the county shall evidence their desire for such removal by an affirmative vote therefor; or, if the removal is to a point nearer the center of the county, and therefore presumably more accessible to the greater portion of the inhabitants of the county, such removal will be authorized by a majority vote of those who participate in an election specially held for the purpose of submitting that question to the arbitrament of the ballot. In either case the fact, and the only fact, which can give the legislature, or the board of supervisors, or any other legislatively designated or selected tribunal, jurisdiction to pass any order in the premises, is the affirmance of the required constitutional majority. It is not the legislative enactment; it is not the expressed approval of the people voting therefor."

It will be seen from the statement of facts in this case that removal was not carried by vote of two-thirds of the electors of Smith county on the day of the election, October 1, 1912. It will also be noted that there is no state-

ment whatever to show that the proposed removal was toward the center of the county. Unless it is shown clearly that the removal proposed is to be toward the center of the county, or if the removal could be made under the decision of the election to any portion of the county, then the election on the question of removal or no removal, as provided in chapter 314, Laws of 1910, must be carried for removal on the vote of two-thirds of the qualified electors of the county. The trial court was correct in sustaining the demurrer filed by appellees.

Affirmed.

*Affirmed.*