[No. 1777.   Decided July 26, 1895.]

JOHN KRIESCHEL, *Respondent*, v. THE BOARD OF COUNTY COMMISSIONERS OF SNOHOMISH COUNTY *et al.*, *Appellants*.

INJUNCTION — REMOVAL OF COUNTY SEAT — FRAUD OF COMMISSIONERS.

Under the constitution and laws of this state a board of county commissioners is not vested with exclusive discretion in the matter of declaring the result of an election held for the removal of the county seat, but an attempt on their part to declare a result contrary to the law is sufficient to give the superior court jurisdiction of an action seeking to enjoin them.

Injunction will lie at the instance of a county commissioner, a resident taxpayer of the county, to restrain the proposed illegal re-

moval of the county seat upon the order of the majority of the board of commissioners.

*Semble*, that under art. 4, § 6 of the constitution, giving the superior court original jurisdiction " of such special cases and proceedings as are not otherwise provided for," the superior court is authorized to assume jurisdiction to enjoin the officers of a county, who, in excess of their powers, are seeking to create a burden on taxpayers by directing an illegal expenditure of public moneys.

*Appeal from Superior Court, Snohomish County.*

*Francis H. Brownell*, and *Crowley, Sullivan & Grosscup*, for appellants.

*S. H. Piles*, and *Sapp & Lysons*, for respondent.

The opinion of the court was delivered by

ANDERS, J.—In response to a petition purporting to be signed by the requisite number of qualified electors of Snohomish county, the board of county commissioners of that county caused to be submitted to the electors of the county, at the general election held in November, 1894, a proposition to remove the county seat from the city of Snohomish to the city of Everett. After the election had been held, and on December 18, 1894, the commissioners caused to be spread upon their records a statement, in substance, that a meeting of the board of county commissioners of Snohomish county was duly and regularly called to assemble at the court house in the city of Snohomish, in said county, on December 16, 1894; that, the returns of the general election held in said county on the 6th day of November, 1894, having been received, the board duly proceeded to canvass and compare the same, and to ascertain the result of said election on the question of the removal of the county seat, and continued in session, for the purpose of such canvass, comparison, and ascertainment, continuously, adjourn-

ing from time to time as necessary; that said board, having duly canvassed, compared, and ascertained the result of said election, as shown by the returns from the voting precincts of the county, upon the question whether the county seat should be removed from the city of Snohomish to the city of Everett, do find, as the result of said canvass, comparison, and ascertainment, that 2,890 votes were cast for, and 1,906 against, removal, and that the total number of votes cast upon the proposition was 4,796 — necessary to removal, 2,878. The record further states that the board thereupon declared the city of Everett to be the county seat of Snohomish county from and after January 21, 1895; that notice of the result of said election be given by posting notices thereof in all the election precincts of said county, and that the county officers whose offices are required by law to be kept at the county seat remove their respective offices, files, records, office fixtures and furniture, and all public property pertaining to their respective offices to the city of Everett, from, on, and after the said January 21, 1895. It also appears from their records that, after examining the certificate of the county canvassing board, the county commissioners, by a majority vote (Mr. Evans voting *contra*), refused to consider, and rejected, the returns from the precincts of Port Gardner and South Snohomish, on the ground that the returns from those precincts bore evidence of erasures and alterations on their face, and appeared to be forgeries, and that the returns of those precincts were in such a condition that it was impossible to determine the correct vote cast in said precincts from said returns.

The respondent, who became one of the commissioners of Snohomish county on or about January 15, 1895, and who theretofore was, and still is, a resident

and taxpayer of said county, brought this action to re-
strain and enjoin the defendants, who were county
officers, from removing their respective offices, or the
files, papers, and property pertaining thereto, from the
city of Snohomish to the city of Everett, in pursuance
of the declaration and order of the board of county
commissioners. The grounds upon which° he asked
the interposition of the court were that the petition
upon which the county commissioners submitted the
proposition of removal to the electors of the county
was not signed by the requisite number of qualified
electors, and was fraudulent and illegal; that the ques-
tion of removal was not properly submitted, for the
reason that no separate ballots or ballot boxes were
prepared for the votes upon the question of removing
the county seat; that the board of commissioners never
canvassed the votes cast on the question of removal,
and never ascertained the result of the election on that
question from the returns from the various election
precincts, but fraudulently, and in violation of law, and
contrary to their knowledge of the fact, declared that
more than three-fifths of the votes cast upon the propo-
sition were in favor of removing the county seat from
Snohomish to Everett; that the law concerning the
removal of county seats, under and by virtue of which
the commissioners submitted the proposition to the
voters of the county, is unconstitutional, inoperative,
and void; and that the removal of the county offices
to the city of Everett will result in an unnecessary and
illegal expenditure of the public moneys, and illegally
and unjustly cause the respondent and all other taxpay-
ers of the county to pay a larger amount of taxes than
they justly ought to pay. Upon the filing of the com-
plaint a temporary restraining order was issued, and
thereafter the cause was set down for hearing upon

plaintiff's motion for a temporary injunction. On the day fixed for the hearing, the defendants appeared and objected to the proceeding on several grounds, among which were that the court had no jurisdiction of the subject-matter of this action, that the complaint failed to state sufficient facts to entitle the plaintiff to the relief demanded, and that the plaintiff had no legal right or capacity to maintain the action. These objections were overruled by the court, and the application for a preliminary injunction was heard upon affidavits submitted by the respective parties. After argument by the respective counsel, and due consideration by the court, a temporary injunction was ordered, to reverse which order this appeal is prosecuted.

It is claimed by the learned counsel for appellants that, under the law of this state as announced in *Parmeter v. Bourne*, 8 Wash. 45 (35 Pac. 586, 757), the court below had no jurisdiction of the subject matter of this controversy, and that it was therefore error to entertain and consider plaintiff's complaint. The case of *Parmeter v. Bourne* involved the removal of the county seat of Pacific county, and it was therein sought to restrain a transfer of the county offices from Oysterville to South Bend, on the alleged ground that fraud had been committed in the counting of the votes by the judges of election, and in the issuing of returns of the election to the board of county commissioners. It was not claimed or pretended that the commissioners themselves did not honestly and faithfully discharge the trust imposed upon them by law. From the returns of the election and the poll books of the several precincts of the county, they ascertained and declared the result of the election on the proposition of removal, and this court was constrained to hold, under the circumstances, that their determina-

tion of the result of the election was final, and could not be set aside by the courts. ' The conclusion arrived at in that case was the result of a careful consideration of the authorities applicable to the questions presented by the record, and we are not now disposed to challenge its correctness. But it must not be understood from that decision that, in no case, can any action of a board of county commissioners respecting the removal of a county seat be called in question, as might perhaps be inferred from some general observations made in the course of the opinion, if considered apart and disconnected from the real questions under consideration. While it was said generally that the removal of a county seat is a political question, it was not intimated that such removal could be effected at the mere will or caprice of the county commissioners, regardless of the law and the constitution of the state. Although a political question, it is nevertheless one over which even the legislature has not absolute and unlimited control, for its power is plainly limited by our constitution. In some of the states the legislature seems to possess practically unrestricted power as to the removal and location of county seats, and, under such circumstances, the courts hold, and not without reason, that where it has designated some body or tribunal to determine the question of removal, the determination of such tribunal is final and conclusive. But we have been referred to no case, and have found none, in which it has been held that a board of county commissioners, to whom the law confides the duty of ascertaining and declaring the result of an election upon a proposition to remove a county seat, can finally and conclusively determine the question in a manner contrary to or different from that prescribed by law. In this state, it is the will of the qualified electors of a

28 — 12 WASH.

county, as expressed by their ballots, and that only, which authorizes the removal or relocation of a county seat. Neither the legislature, nor the county commissioners, who are its agents, can effect a removal in any other way than by a submission to popular vote. The only power the commissioners have with respect to the matter is the power to submit the question to a vote of the people, and to ascertain, declare, and publish the result of the election thereon. When they have submitted the proposition to the electors, and have ascertained from the returns that three-fifths of all the votes cast upon the proposition are in favor of removal, it is their duty to give the proper notice and declare the county seat to be at the place so selected from and after a specified date, not more than ninety days after the election. See Gen. Stat. tit. 38 ch. 3.

An examination of the law concerning the removal of county seats will disclose the fact that the legislature did not intend to clothe the several boards of county commissioners in this state with arbitrary power to determine this question, for it provided that:

"When the returns have been received and compared, and the results ascertained by the board, if three-fifths of the legal votes cast by those voting on the proposition are in favor of any particular place, the board must give notice of the result by posting notice thereof in all the election precincts in the county."

The statute also provides that the place selected to be the county seat of the county must be so declared in the notice mentioned in the section which we have just quoted, but this language evidently does not mean that the place selected by the *board* shall be the county seat, but the place selected by the people of the county and declared so selected by the board. The statute

upon the subject is in perfect accord with the constitution, for that instrument declares that:

"No county seat shall be removed unless three-fifths of the qualified electors of the county voting on the proposition at a general election, shall vote in favor of such removal, and three-fifths of all the votes cast on the proposition shall be required to relocate a county seat." Const. art. 11 § 2.

While the removal of a county seat necessarily involves the exercise of political or legislative power, it is thus seen that the people, the source of all political power, have not seen fit to leave the matter of removal to the unrestricted will of the legislature. And, although the legislature has delegated certain powers to the county commissioners, it has taken care to designate the character of their duties and the manner of discharging them. What, then, would be the consequence should a board of county commissioners in a given case declare a county seat removed without first ascertaining whether or not the legal and constitutional number of votes had been cast in favor of such removal? Would such a declaration effect a removal in spite of the contrary declaration of the constitution and the law? The contention of appellants is, in effect, that it would, but we think their position is untenable. If the county commissioners can cause the removal of a county seat by a mere declaration, unwarranted by the law or the facts of the case, then it was the extreme of folly on the part of the framers of the constitution to incorporate into the fundamental law the provision above quoted, and the legislature did a vain and useless thing when it enacted a law for their guidance. If there is no legal remedy for such a wrong, it were far better if this question had been left to their uncontrolled discretion.

But, since the law is otherwise, it becomes necessary to determine whether, upon the facts presented by the record, the court below was warranted in awarding the preliminary injunction of which appellants complain. We think it may be stated as a general proposition that every citizen has a right to be protected against the consequences of the illegal acts of all persons. If, therefore, the board of commissioners, were not authorized, in this instance, by the facts and the law, to declare that the city of Everett had been selected as the county seat of Snohomish county, we must conclude that the respondent was entitled to be relieved, in some manner or form of action, from any injurious consequences which would result to him from the removal of the county seat to that place. In *Rickey v. Williams*, 8 Wash. 479 (36 Pac. 480), this court affirmed the judgment of the lower court enjoining the removal of the county seat of Stevens county, on the ground that the board of county commissioners acted upon an insufficient petition in submitting the question to a popular vote, and it was also held in that case that a county officer whose office was required by law to be kept at the county seat might maintain an action to enjoin an illegal removal thereof — that is, a removal attempted to be consummated by an illegal and void election. In this case, the petition upon which the commissioners acted seems to have been sufficient. At least, the trial court so concluded, and we see nothing in the record indicating error in that regard.

But it is alleged, in effect, in the complaint and proved by the evidence, that the board of county commissioners never received, compared, or canvassed the returns of the election upon the question of the re-

moval of the county seat.   The proof fairly shows that
neither the returns nor the poll books were ever in the
possession  of  the  board  of  commissioners.   It  is
claimed, however, that a majority of the board were
present at the canvass of the election returns made by
the county canvassing board, of which the chairman
of the board of county commissioners was, *ex officio*, a
member, and by that means ascertained the result of
the election on the proposition of removal.   But there
was no session of the board of commissioners during
the time the county canvassing board was in session,
and no such meeting could have been held unless the
chairman of the board of commissioners was capable of
acting  as  a  member  of  two  boards  and  discharging
distinct  duties  at  one  and  the  same  time, which we
hardly  think  was  possible.   Mr.  Evans,  one  of  the
county commissioners, knew nothing of any meeting
of the board between the 16th and 18th days of De-
cember, and on the latter date the board were not
in  session  to  exceed  fifteen  minutes.   The  orders we
have  mentioned,  and  which  were  entered  upon  the
records, were prepared in advance of this meeting by
a majority of the board, and were adopted as expedi-
tiously as possible, evidently with the intention that no
one  should  interfere  to  prevent  the  removal  of  the
county seat to Everett.   In the absence of the returns
and poll books, and without considering the returns
from the precincts of Port Gardner and South Sno-
homish, the correct number of votes in which pre-
cincts they say they were unable to ascertain, two
members of the board declared that the city of Everett
had  received  more  than  three-fifths  of  all  the  legal
votes cast upon the question of removal and thereby
became the county seat of Snohomish county.   The

records of the board itself, as well as the evidence adduced at the trial, conclusively show that the number of legal votes cast upon the proposition was not ascertained by the board of county commissioners. And in that matter they were vested with no arbitrary, or even discretionary power. They were commanded by the law to ascertain, *from the returns*, whether a sufficien number of votes had been cast to authorize the removal of the county seat, and not simply to *declare* that the required number had been cast.

The result of the election not having been ascertained, the pretended canvass and ascertainment by the board was not merely irregular, but absolutely void, and constituted no foundation or authority whatever for the order and declaration entered upon the records. So far as the location of the county seat is concerned, the effect of the election is neither greater nor less than if no election whatever had been held upon the proposition; and it follows for aught that appears to the contrary, that the city of Snohomish is still the county seat of Snohomish county. And that being so, the question is: Can a county officer and a taxpayer maintain an action to enjoin its removal and prevent the consequent illegal expenditure of public money? That he may do so was determined by this court in *Rickey v. Williams, supra*. In *Crampton v. Zabriskie*, 101 U. S. 601, the court said:

"Of the right of resident taxpayers to invoke the interposition of a court of equity to prevent an illegal disposition of the moneys of the county or the illegal creation of a debt which they in common with other property holders of a county may otherwise be compelled to pay, there is at this day no serious question. The right has been recognized by the state courts in numerous cases, and from the nature of the powers.

exercised by municipal corporations, the great danger of their abuse, and the necessity of prompt action to prevent irremediable injuries, it would seem eminently proper for courts of equity to interfere upon the application of the taxpayers of a county to prevent the consummation of a wrong, when the officers of those corporations assume, in excess of their powers, to create burdens upon property holders."

Upon the authority of these cases, and many others which might be cited, as well as upon considerations of right and justice, we conclude that the court below properly interfered to prevent the consummation of a wrong which would otherwise have resulted from the unwarranted and illegal acts of the majority of the board of county commissioners.   Moreover, it must be conceded that there is much force in the suggestion of counsel for respondent that § 6 of art. 4 of the state constitution, conferred jurisdiction upon the superior court to hear and determine this action.   It is there provided that "the superior court shall have original jurisdiction  .  .  .  of such special cases and proceedings as are not otherwise provided for."   This provision of the constitution was not pressed upon the attention of this court or passed upon in either of the county seat cases above mentioned.   The language there used is certainly very broad and comprehensive, and might well be said to apply to cases of this character, as they are "not otherwise provided for," and, if contemplated at all, fall within the purview of this provision.   At all events, it is manifest that it was not the intention of the framers of this § 6 to exclude any sort or manner of causes from the jurisdiction of the superior court.

As what we have already said disposes of this case, it becomes unnecessary to enter upon a discussion of

other points made in the briefs of the learned counsel for the respective parties.

The judgment is affirmed.

Hoyt, C. J., and Scott, J., concur.

Dunbar, J. (*dissenting*). I am unable to distinguish this case from that of *Parmeter v. Bourne*, 8 Wash. 45 (35 Pac. 586, 757), and *State, ex rel. Reed, v. Jones*, 6 Wash. 452 (34 Pac. 201), and as, in my opinion, this court in those cases decided the principles involved in this case in favor of the appellant, it follows that the judgment should be reversed.

Gordon, J.—I concur in what is said by Judge Dunbar.